ANN CRAWFORD McCLURE, Chief Justice
Manuel Torres appeals his conviction for the murder of his wife, Lilia Reyes Torres. The couple was married for three years. At approximately 2 a.m. on April 27, 2013, Appellant called his son, Isaac, who arrived at his home at approximately 2:30 a.m. After arriving, Isaac called 911. Police and fire department personnel responded to the Torres residence in El Paso near 3 a.m. Fire department personnel informed police that a deceased female was inside the home, and Appellant was transported to police headquarters.
After being advised of his rights, Appellant confessed that he had strangled Lilia after she had allegedly committed aggressive acts subsequent to his complaints regarding how she had spent her day and upon his accusation, or possibly her admission, that she had been unfaithful. Appellant's statement to police was recorded. He unsuccessfully sought to suppress the recording *410 prior to trial. After the defense rested, the State was permitted to call a rebuttal witness, Azucena Batres, who provided extraneous offense information. The trial court instructed the jury on self-defense and on provoking the difficulty as a limitation on self-defense. After finding him guilty of murder, a jury sentenced Appellant to 50 years' confinement. Appellant appeals his conviction, and complains of trial court error in failing to suppress a video confession, in charging the jury, and in improperly admitting extraneous offense evidence during the guilt phase of trial. We affirm the trial court's judgment.
DENIAL OF MOTION TO SUPPRESS CUSTODIAL STATEMENT
After hearing evidence and argument, the trial court denied Appellant's motion to suppress his custodial statement to police.[1] In Issue One, Appellant complains the trial court erred when it failed to suppress his video-recorded confession because the recorded statement was not made in compliance with article 38.22, and because he was not expressly asked whether he waived his right to counsel and his right to remain silent. TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2017).
Standard of Review
We review a trial court's ruling refusing to suppress evidence for an abuse of discretion. Crain v. State, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010) ; Ramos v. State, 245 S.W.3d 410, 417-18 (Tex.Crim.App. 2008). In reviewing the trial court's decision, we review the evidence in the light most favorable to the trial court's ruling. State v. Kelly, 204 S.W.3d 808, 818 (Tex.Crim.App. 2006). We afford almost total deference to a trial court's determination of historical facts, but review pure questions of law de novo. Alford v. State, 358 S.W.3d 647, 652 (Tex.Crim.App. 2012) ; see Montanez v. State, 195 S.W.3d 101, 109 (Tex.Crim.App. 2006). Likewise, we give almost total deference to a trial court's resolution of mixed questions of law and fact if those questions turn on the credibility and demeanor of witnesses. Alford, 358 S.W.3d at 652. However, if credibility and demeanor are not necessary to the resolution of a mixed question of law and fact, we review the question de novo. Alford, 358 S.W.3d at 652. This same deferential standard of review applies to a trial court's determination of historical facts, demeanor, and credibility even when that determination is based on a video recording. State v. Duran, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. Ramos, 245 S.W.3d at 418.
Analysis
To render his statements "stemming from custodial interrogation" admissible as evidence against him, Miranda requires that an accused be properly admonished of certain constitutional rights. See Miranda v. Arizona , 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Likewise, all the requirements of article 38.22, including the requirement that an oral statement be recorded and that the accused be warned in accordance with the article, apply to statements of an accused "made as a result of custodial interrogation." TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a)(2) (West Supp. 2017).
*411 Article 38.22 also requires that an accused's waiver of his rights as set out in the warning be made knowingly, intelligently, and voluntarily. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2) (West Supp. 2017).
Appellant contends the trial court erred in failing to suppress his custodial confession because he did not affirmatively waive his Miranda rights. However, article 38.22 does not require that an accused expressly or explicitly waive his rights, nor does it require that an accused be asked whether he wishes to waive his rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2017); see also Joseph v. State , 309 S.W.3d 20, 24 (Tex.Crim.App. 2010)quoting Watson v. State , 762 S.W.2d 591, 601 (Tex.Crim.App. 1988) (no requirement that waiver be made in writing or by express oral statement); Barefield v. State , 784 S.W.2d 38, 40 (Tex.Crim.App. 1989) ( article 38.22 does not require an express waiver). The statute only requires that the requisite warnings be given to the accused, and that the accused's waiver of rights be made knowingly, intelligently, and voluntarily. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2) (West Supp. 2017). Consequently, Appellant's contention that the trial court erred in denying his motion to suppress his statement on the basis that he did not expressly waive his rights is without merit.
The question we must resolve is whether Appellant waived his Miranda rights knowingly, intelligently, and voluntarily. North Carolina v. Butler , 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Appellant contends compelling factors, including his alleged impaired state, the detective's knowledge of his alleged impaired state, and Appellant's failure to affirmatively waive his rights, when considered under the totality of the circumstances, indicate that his waiver of rights was not knowingly, intelligently, and voluntarily made. On this basis, Appellant contends his custodial statement was rendered involuntary and subject to suppression.
The burden of showing the accused's knowing, intelligent, and voluntary waiver of his rights falls upon the State. See Joseph , 309 S.W.3d at 24. To satisfy its burden, the State need only prove an accused's waiver by a preponderance of the evidence. See itation case-ids="7322477" index="19" url="https://cite.case.law/sw3d/309/20/#p24">id. In some cases, we may infer a waiver from the interrogated person's actions and words. Butler, 441 U.S. at 373, 99 S.Ct. at 1757.
To determine whether Appellant knowingly, intelligently, and voluntarily waived his Miranda rights we implement the two-step standard set out in Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). We first consider whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and then determine whether the waiver was made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Id. We may conclude that Appellant's Miranda rights have been waived only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension. Id. (citation omitted). This "totality-of-the-circumstances approach" requires our consideration of "all the circumstances surrounding the interrogation," including the defendant's experience, background, and conduct. Fare v. Michael C. , 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) ; see also Butler, 441 U.S. at 374-75, 99 S.Ct. at 1758.
Voluntariness
Our examination of the totality of the circumstances surrounding the interrogation *412 shows Appellant, a roofing salesman, voluntarily waived his rights, and made a free and deliberate choice. In the recording of Appellant's police statement, Detective Mike Lara noted that Appellant spoke to him in English, and Appellant affirmed that he speaks English. He proceeded to warn Appellant that he had the right to remain silent and to refrain from making any statement, and warned him that any statement he made may be used against him at trial and as evidence against him in court. Detective Lara advised Appellant that he had the right to have his lawyer present to advise him prior to and during questioning, the right to have counsel appointed if he could not afford counsel, and the right to terminate the interview at any time. He also informed Appellant, who is not a U.S. citizen, that he possessed the right to contact his consulate, and explained to Appellant, "It says right here, 'I understand my rights and I hereby knowingly, intelligently, and voluntarily waive these rights.' "
After Detective Lara asked Appellant whether he understood the rights that had been read to him, Appellant responded, "Yes." Appellant did not request an attorney but proceeded to speak unfettered for approximately 50 minutes, freely answering questions asked of him and providing a significant narrative regarding his day and his encounter with Lilia. Appellant never asked that the interview be terminated, never invoked his right to counsel, and seemed willing to explain the events that had transpired. The video recording of Appellant's custodial statement shows no evidence of intimidation or coercion, nor physical or psychological pressure to elicit statements from Appellant.
When the trial court denied the motion to suppress, the judge noted that he had seen the video recording of Appellant's custodial statement as well as many other videos where coercive attempts to extract statements were apparent, and observed that "in this particular case, it appeared to me like this was a real tragic event that occurred and ... my impression was [Appellant] couldn't wait to get it all off of his chest; he wanted to say what he was saying; let everybody know what had happened."
Awareness
The totality of the circumstances surrounding the interrogation shows Appellant's waiver was made with full awareness of both the nature of the rights he abandoned as well as the consequences of his decision to abandon them. See Joseph , 309 S.W.3d at 27. The warnings that Detective Lara read to Appellant made him fully aware of his rights under article 38.22 and Miranda , and of the consequences of waiving those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a)(2) (West Supp. 2017); Miranda , 384 U.S. at 444, 86 S.Ct. at 1612. Appellant affirmatively acknowledged that he understood his rights, and his conduct during this portion of the recorded interview demonstrates Appellant possessed the requisite level of comprehension.
We are unpersuaded by Appellant's arguments regarding the influence of Xanax on the knowing, intelligent, and voluntary waiver of his rights. At the suppression hearing, Sergeant John Surface testified that he was dispatched and arrived at Appellant's residence at almost 3 a.m. Appellant was quiet and non-lethargic, and neither appeared to be under the influence of anything nor informed Sgt. Surface that he had taken any medication. Detective Lara testified that during his interview with Appellant, which began at about 5 a.m. on Saturday, April 27, 2013, he did not think Appellant was intoxicated, under the influence, or acting strangely, and observed *413 that Appellant answered his questions and corrected him on occasion, as when Detective Lara referred to "an argument," and Appellant explained, "That's not an argument." Near the end of the interview, Appellant informed Detective Lara that he had consumed some beer after getting off from work and had taken 30 Xanax tablets after he had killed Lilia. Detective Lara, who had seen people intoxicated before, noted that Appellant did not appear to be under the influence at the time of the interview.
During the suppression hearing, Appellant testified that he drank three beers earlier in the day. Between 10 or 10:30, after Lilia had died, Appellant took approximately 20 Xanax and three or four pills for blood pressure with some beer. He then passed out near 10 or 11, awakened at 2 a.m. and called his son, Isaac, to come to the house because "something serious" had happened. Appellant professed that he did not remember being read his rights nor whether he understood them, and did not understand that he could have invoked his rights. He estimated that he was under the influence of the Xanax for 24 hours, and was not clear-headed but was in a state of shock when he was interviewed. He stated that he vaguely remembered what he had seen on the video recording of his custodial statement, but acknowledged that the recording shows that he voluntarily and continuously answered Detective Lara's questions.
Appellant's recorded custodial statement shows that he informed Detective Lara that he had consumed one-half quart of beer at work near the time he arrived home at 4 p.m. on Friday, April 26, 2013, when he pressed Lilia regarding her failure to collect money for a roofing job in accordance with his wishes, and accused her of having an affair. Appellant's beer consumption occurred approximately 11 hours before the recording of the custodial statement began. After Appellant informed Detective Lara that he had consumed 30 Xanax with some beer, Detective Lara asked him how he was feeling. When Appellant stated that he did not feel well, Detective Lara twice asked Appellant whether he needed to go to the hospital. Appellant declined these offers, noting, "No, I should be all right," and then continued to answer questions and provide a narrative regarding the events leading to his wife's death. Detective Lara again asked Appellant how he felt since Appellant's stomach was audible, and subsequently asked again whether Appellant felt "okay." Appellant stated that he felt fine but was very tired, noting that he had taken Xanax. Detective Lara again asked Appellant if he wished to go to the hospital, and when Appellant declined, Detective Lara advised, "I'm gonna check up on that, though, okay, for you." He then had emergency services personnel examine Appellant at the police station. The responding paramedic, Ruben Aparicio, had witnessed Xanax overdoses on multiple occasions. At the suppression hearing, he explained that persons who have overdosed on Xanax are generally very groggy, very unresponsive, and can suffer from an inability to breathe and, "further on down the line, death." He clarified that these symptoms are "multiplied times 10 if you drink alcohol with [Xanax ]."
When he examined Appellant at approximately 8 a.m. on April 27, 2013, Aparicio repeatedly asked Appellant about his medical condition and orientation, but did not conclude that Appellant was under the influence of Xanax because Appellant was talking, lucid, conscious, alert, "oriented times four," knew where he was, and knew what was occurring. Aparicio, who had been an emergency medical technician for approximately 30 years, explained that if Appellant had taken 30 Xanax pills, Appellant *414 "would have never left the scene where it actually happened" because he would have been completely unconscious within two hours. Appellant repeatedly refused offers to be transported to a physician or to a hospital.
The evidence presented to the trial court during the suppression hearing supports a finding that Appellant knowingly, intelligently, and voluntarily waived his rights under article 38.22 and Miranda , and therefore supports the trial court's denial of Appellant's motion to suppress. Because the trial court did not abuse its discretion, we overrule Issue One.
ALLEGED CHARGE ERROR-PROVOKING THE DIFFICULTY INSTRUCTION
In Issue Two, Appellant globally asserts, "The trial court erred by selecting a jury instruction including provocation on the part of appellant, restricting his right to self-defense[,]" and specifically contends that no evidence supported the inclusion of the provoking the difficulty instruction.
Standard of Review and Applicable Law
When analyzing a jury charge issue on appeal, we utilize a two-pronged test and first determine whether there was error, and if so, then determine whether the error caused sufficient harm to warrant a reversal. Ngo v. State , 175 S.W.3d 738, 743 (Tex.Crim.App. 2005) ; Almanza v. State , 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The amount of harm necessary to warrant a reversal depends on whether the appellant objected to the jury charge. Ngo , 175 S.W.3d at 743 ; Almanza , 686 S.W.2d at 171 (the degree of harm required for reversal depends on whether error was preserved at trial); Neal v. State , 256 S.W.3d 264, 278 (Tex.Crim.App. 2008). If charge error was preserved, we review for "some harm," but we review unpreserved error for egregious harm. Almanza , 686 S.W.2d at 171. We base a determination of egregious harm on a finding of actual rather than theoretical harm. See Cosio v. State , 353 S.W.3d 766, 777 (Tex.Crim.App. 2011). To establish actual harm, the charge error must have affected the very basis of the case, deprived Appellant of a valuable right, or vitally affected a defensive theory. Id.
The Charge Conference
The charge conferences were held on two consecutive days. On the first day, defense counsel specifically objected to the level of force included in the self-defense portion of the charge, and requested that the trial court instruct the jury under Texas Penal Code section 9.31 (Self-Defense) rather than charging the jury regarding the use of "deadly force" as set out in section 9.32 (Deadly Force in Defense of Person), because the facts supported an instruction on "regular" self-defense. TEX. PENAL CODE ANN. §§ 9.31 (Self-Defense), 9.32 (Deadly Force in Defense of Person). The following day, defense counsel requested that the trial court instruct the jury on the statutory provisions of self-defense of section 9.31, and noted that the trial court was instructing the jury regarding the provisions of section 9.32. He then proceeded to additionally request, whether under section 9.31 or 9.32, that an application provision be included in the self-defense instruction indicating that the State had "the burden of proving beyond a reasonable doubt and, if [you're] going to use deadly force, that Lilia Reyes was not using deadly force and that the State have the burden of proving beyond a reasonable doubt that Manuel Torres was using deadly force." Defense counsel specifically wanted the application paragraph to provide the definitions of "intentionally causing the death and knowingly causing the *415 death," and in the alternative portion include the definitions for "serious bodily injury." He requested that the application paragraph list all elements of the offense for which the State had the burden to prove. The trial court informed defense counsel that the application paragraph would track the indictment and that the elements of the offense were present in the indictment.
Defense counsel next requested that an application paragraph on self-defense be included and list the elements required for self-defense and what action the jury must take if the State failed to prove its case beyond a reasonable doubt as to the issue of self-defense. The trial court overruled the request. The trial court also overruled Appellant's requests to provide similar application paragraphs for the lesser-included offense of manslaughter. After the State responded that it did not believe Appellant was entitled to the instruction as to self-defense on manslaughter but would not oppose it, the trial court agreed to consider it. The trial court ultimately overruled Appellant's request to instruct the jury on "the alternative lesser included of criminal negligent homicide with its elements, definitions, and applications."
The Court's Charge
The trial court instructed the jury on self-defense and on provoking the difficulty as a limitation on self-defense, and included application paragraphs for each. With minor exceptions about which Appellant does not complain, our research and review of the jury charge reflects that the trial court's application paragraphs on these matters track the standard pattern jury charge forms regarding self-defense and provoking the difficulty. See § 106.16. Provoking the Difficulty-Limitation on Self-Defense, 8 Tex. Prac., Criminal Forms and Trial Manual § 106.16, § 106.17. Provoking the Difficulty-Abandonment, 8 Tex. Prac., Criminal Forms and Trial Manual § 106.17 (11th ed.) (West 2005).
Preservation of Error
We find no instance in the record in which defense counsel expressly objected to the trial court's instruction in the charge regarding the issue of provoking the difficulty. Error in a jury charge may be preserved by submitting a proposed instruction. TEX. CODE CRIM. PROC. ANN. art 36.15 (West 2006) ; Chase v. State , 448 S.W.3d 6, 12 (Tex.Crim.App. 2014) (citations omitted). Appellant filed a proposed instruction on self-defense which specified, "Self defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant." The only other proposed instruction containing a reference to provocation which Appellant tendered to the trial court addressed "Failure to Retreat," and explained that a person with the right to be present need not retreat before using force if, in part, he did not provoke the person against whom the force was used. Appellant's proposed "Failure to Retreat" instruction also advised that in deciding whether the defendant reasonably believed his use of force was necessary, jurors must not consider any failure to retreat if, in part, the defendant did not provoke Lilia Reyes Torres. We conclude Appellant has not preserved error regarding the trial court's provoking-the-difficulty instruction. Therefore, if charge error exists, we will determine whether Appellant has shown egregious harm.
Provoking the Difficulty
Provoking the difficulty is a limitation on a defendant's right to self-defense.
*416 Elizondo v. State , 487 S.W.3d 185, 196 (Tex.Crim.App. 2016). "The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense." Smith v. State , 965 S.W.2d 509, 512 (Tex.Crim.App. 1998).
In Smith v. State , the Court of Criminal Appeals explained that a charge on provocation is required when there is sufficient evidence that: (1) the defendant did some act or used some words that provoked the attack; (2) such act or words were reasonably calculated to provoke the attack; and (3) the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other. Elizondo , 487 S.W.3d at 197citing Smith , 965 S.W.2d at 514. However, an instruction on provocation should only be given when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt. Smith , 965 S.W.2d at 514.
In determining whether the trial court's instruction was properly included, we consider whether there was sufficient evidence from which a rational jury could have found provocation beyond a reasonable doubt, and view "the evidence in the light most favorable to giving the instruction." Smith , 965 S.W.2d at 514. If the facts do not support inclusion of a charge on provoking the difficulty, the instruction must not be given as it would constitute an unwarranted limitation on the right of self-defense constituting trial court error. See Elizondo , 487 S.W.3d at 197. In sum, the standard neither requires the judge to serve as fact finder nor to assess the credibility or strength of the evidence but, rather, simply requires that the judge decide whether evidence has been presented that could support a jury's finding of all three elements of provocation beyond a reasonable doubt. Id. We are required to address all three Smith elements. Id.
Evidence of Provocation
To satisfy the first Smith element, a jury must merely be able to find that there was some provoking act or words, and this finding can be made through inference relying on circumstantial evidence. Smith , 965 S.W.2d at 515. If the evidence allows an inference beyond a reasonable doubt that the victim attacked the defendant in response to something the defendant did or said, this will be sufficient to allow the jury to find the first issue in the affirmative. Smith , 965 S.W.2d at 516. Was evidence presented that could support a jury's finding of this element? We answer affirmatively.
The evidence showed that Appellant left work early and came home at approximately 2 p.m. with the understanding that a roast dinner was being prepared and guests were coming over. When Appellant arrived home, Lilia was not home and there was no roast dinner. Lilia did not arrive home until 3:30 or 3:45, and an argument soon ensued. Appellant chided Lilia for picking up her sister-in-law and failing to collect money from one of his clients. Lilia explained to him that she had too many things to do and had been unable to make the collection. Appellant informed Lilia that she should have made the collection first. According to Appellant, Lilia responded that her sister-in-law was more important and told Appellant, "Don't bother me."
Lilia became upset after Appellant began questioning her, and allegedly grabbed a spatula which Appellant "diffused." Lilia went outside while it was daylight and finally reentered the house when it was *417 dark, at approximately 10:30 or 11 p.m. Appellant continued questioning Lilia about where she had been all day, asking "What have you done?" Lilia became upset and informed Appellant that she did not care what Appellant thought. Appellant admitted his belief that Lilia was upset because he was questioning her regarding where she had been that day and conceded that Lilia had become angry regarding his accusations of her marital infidelity, which led to "much arguing." Appellant subsequently testified that he did not accuse Lilia of marital infidelity and that Lilia had informed him that she had been unfaithful. According to Appellant, Lilia reportedly admitted to him that she had "been screwing here and there[.]" In response, Appellant told Lilia, "If you are, then that's your fucking deal, you know[,]" and commented that he was very disappointed.
After Lilia came in from outside, and while she was purportedly seated on the couch with Appellant, he asked Lilia, who was "still furious," to go to bed. Lilia again told Appellant, "Don't bother me," and began kicking, and hitting him with a fisted hand. Appellant, who described himself as 5' 8? tall and weighing 210 pounds, stood up and stated, "Don't try to hit me. Don't hit me ... I don't hit you[.]" Appellant then grabbed five-foot tall Lilia by the neck. After Lilia fell to the floor, Appellant admitted that he could "feel her faint breathing," but placed her on the couch, did nothing to help her, and did not call for emergency assistance.
This evidence allows an inference beyond a reasonable doubt that Lilia attacked Appellant in response to something he did or said, and the trial court properly decided that the evidence presented could support a jury's finding of the first element of provocation beyond a reasonable doubt. See Elizondo , 487 S.W.3d at 197 ; Smith , 965 S.W.2d at 516.
Words or Acts Reasonably Calculated to Provoke
A defendant's actions or words that are reasonably calculated to provoke an attack comprise the second Smith element justifying an instruction on provoking the difficulty. Elizondo , 487 S.W.3d at 199 ; Smith , 965 S.W.2d at 514. Even if acts or words may cause an attack on the defendant, the defendant will not lose his right to self-defense if such acts or words were not reasonably calculated to do so. Elizondo , 487 S.W.3d at 199 ; Smith , 965 S.W.2d at 517. "An act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack." Elizondo , 487 S.W.3d at 199 ; Smith , 965 S.W.2d at 517. Words alone may provoke a difficulty if they are clearly designed to do so. Elizondo , 487 S.W.3d at 199 ; Smith , 965 S.W.2d at 517. The act or words taken in conjunction with the relations of the parties and other circumstances surrounding the difficulty can provide the basis for such a finding. Smith , 965 S.W.2d at 517.
Present in the record is evidence that the arguments between Appellant and Lilia began in the afternoon and continued into the late evening, from daylight to darkness. The arguments were initiated in the afternoon by Appellant's comments to Lilia in which he disapproved of her failure to prioritize the collection of a customer's payment related to Appellant's employment, which he believed to be more important than Lilia providing assistance to her sister-in-law, and continued into the evening with his admitted, and then recanted, assertion that he had accused Lilia of cheating on him. Appellant admitted, "[T]here was much arguing." Lilia had stayed outside from the time it was daylight until 10:30 or 11 p.m. After this, Appellant told Lilia to "com[e] to bed," and *418 she began striking Appellant. On at least two occasions during this course of events, Lilia had asked Appellant to not bother her.
This evidence allows an inference beyond a reasonable doubt that Appellant's words were reasonably calculated, or were reasonably capable of causing, or had a tendency to cause Lilia to attack Appellant, and the trial court properly decided that the evidence presented could support a jury's finding of the second element of provocation beyond a reasonable doubt. See Elizondo , 487 S.W.3d at 197 ; Smith , 965 S.W.2d at 516.
Pretext for Harm
The third Smith element justifying a trial court's provoking-the-difficulty instruction requires the presence of some evidence from which a rational jury could find beyond a reasonable doubt that the defendant's act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the victim. Elizondo , 487 S.W.3d at 197 ; Smith , 965 S.W.2d at 518. In other words, to support the giving of a provoking-the-difficulty instruction in the jury charge, there had to be evidence raised from which a rational jury could find beyond a reasonable doubt that Appellant possessed an intent to provoke so he would have a pretext to harm Lilia under a guise of self-defense. Elizondo , 487 S.W.3d at 201. "Even though a person does an act, even a wrongful act, which does indeed provoke an attack by another, if he had no intent that the act would have such an effect as part of a larger plan of doing the victim harm, he does not lose his right of self-defense." Elizondo , 487 S.W.3d at 200quoting Smith , 965 S.W.2d at 518.
Intent can be determined from a defendant's words, acts, and conduct, occurring before, during, or after the provocation. Elizondo , 487 S.W.3d at 201 ; Smith , 965 S.W.2d at 514. Intent is a fact question to be determined from all the circumstances. Elizondo , 487 S.W.3d at 201. The acts of provocation alone can carry the inference of intent, and a defendant's actions during or after the provocation can illuminate his intent. Elizondo , 487 S.W.3d at 202. A defendant's prior acts can also give character to what he said or did at the time of the offense, which can aid in both explaining his words or acts and determining his intent. Elizondo , 487 S.W.3d at 202. A jury can rely upon wholly circumstantial evidence to find provoking acts or words, but such evidence must create more than a suspicion because juries are not permitted to reach speculative conclusions. Id. at 203 ; Smith , 965 S.W.2d at 515-16.
Here, taken as a whole, the circumstantial evidence permits a non-speculative jury finding that Appellant's provoking acts or words were done or said as a pretext for killing Lilia. Appellant not only knew Lilia, he was married to her. At trial, Appellant admitted that he had suspected Lilia of being unfaithful and had confronted her about his suspicions as much as two months before she died.
On the day she died, Appellant left work early, at 2 p.m. rather than 5 p.m., and was waiting for Lilia when she arrived home one and one-half to two hours later. Although Appellant initially testified that he was expecting to have a roast dinner with Lilia and had gone home early "because we wanted to be together," he also testified that his ex-wife and daughter were intended guests. According to Appellant, Lilia had invited his ex-wife and daughter to their home, and he "wanted to make a good day out of it." But Appellant also explained that there was no roast, and claiming that he did not cancel the gathering, *419 noted without explanation that his ex-wife and daughter never arrived.
After she arrived home, Appellant began questioning Lilia regarding how and with whom she had been spending her time, and admitted that his inquiries had resulted in "much arguing" which expanded into the evening. After Lilia informed Appellant that she had been unfaithful, Appellant manually strangled her, and although Appellant admitted that he "knew something was very wrong" and could feel Lilia's faint and shallow breathing, he did not call 911. After Appellant placed Lilia on the couch, he did not call for emergency assistance. Instead, he called his daughter before he napped, and told her that he loved her. There is no evidence in the record that Appellant told his daughter what he had done to Lilia or that he sought her assistance on behalf of Lilia. After Appellant slept, awakened, touched Lilia's leg and felt that it was cold, he covered her with a blanket, but did not call 911. He eventually called his son to come pick him up.
Appellant's testimony also presented some evidence of his disdain toward Lilia when on a prior occasion she had stayed out late without him and knocked at the door in the early morning requesting that Appellant unlock the door for her. At that time, Appellant informed Lilia, "I didn't have you out there. Now you expect me to unlock the door for you?" The medical examiner also testified that Lilia's body bore evidence of not only fresh injuries but older bruises as well, photographs of Lilia's bruised body and limbs were admitted into evidence.
Viewing the evidence in a light most favorable to giving the instruction, we conclude that the evidence was sufficient for a reasonable jury to find, beyond a reasonable doubt, that Appellant did or said something with the purpose and intent of creating a pretext for killing Lilia under the guise of self-defense, and the trial court properly decided that the evidence presented could support a jury's finding of the third element of provocation beyond a reasonable doubt. See Elizondo , 487 S.W.3d at 197 ; Smith , 965 S.W.2d at 516. Because the trial court's provoking-the difficulty instruction was not erroneously given, we overrule Issue Two.
ERRONEOUS ADMISSION OF EXTRANEOUS EVIDENCE UNDER RULE 404(B)
In Issue Three, Appellant contends the trial court erred when it allowed Azucena Batres to testify during the guilt-innocence phase of trial regarding a prior occasion when Appellant had placed his hands on her neck. We disagree.
Standard of Review
We review a trial court's ruling on the admissibility of extraneous offenses under an abuse-of-discretion standard. De La Paz v. State , 279 S.W.3d 336, 343 (Tex.Crim.App. 2009) ; Montgomery v. State , 810 S.W.2d 372, 379 (Tex.Crim.App. 1990). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and we will uphold the trial court's ruling. De La Paz , 279 S.W.3d at 343-44. A trial court's ruling is generally within this zone if the evidence shows that: (1) an extraneous transaction is relevant to a material, non-propensity issue; and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. Id. at 344. Moreover, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his correct ruling. Id.
*420 Rule of Evidence 404(b)
Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or bad acts is not admissible during the guilt-innocence phase of trial as evidence that the defendant acted in conformity with his character by committing the charged offense. TEX. R. EVID. 404(b)(1). However, extraneous offense evidence may be admissible if it has relevance beyond character conformity, such as showing motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident. TEX. R. EVID. 404(b)(2). The enumerated exceptions to Rule 404(b) are neither mutually exclusive nor collectively exhaustive. Montgomery , 810 S.W.2d at 377. For example, extraneous offense evidence may also be admitted to rebut a defensive theory. See Crank v. State , 761 S.W.2d 328, 341 (Tex.Crim.App. 1988) ("Probably the most common situation which gives rise to the admission of extraneous offenses is in rebuttal of a defensive theory."), disapproved on other grounds by Alford v. State , 866 S.W.2d 619, 624 n.8 (Tex.Crim.App. 1993).
Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. The question of whether extraneous offense evidence has relevance apart from character conformity is a question for the trial court. De La Paz , 279 S.W.3d at 343.
Rule 403 provides that a trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence, and this too is a question for the trial court. TEX. R. EVID. 403 ; see De La Paz , 279 S.W.3d at 343. In conducting a Rule 403 balancing test, the trial court must balance (1) the inherent probative value of the evidence and (2) the State's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be needlessly cumulative. See Gigliobianco v. State, 210 S.W.3d 637, 641-42 (Tex.Crim.App. 2006). In practice, these factors may well blend together. Id.
Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. See De La Paz , 279 S.W.3d at 343citing Montgomery , 810 S.W.2d at 388 ("[W]hen the trial court is called upon by sufficient objection to balance probativeness and prejudice, the presumption is now that probativeness is the weightier consideration unless in the posture of the particular case the trial court determines otherwise."); Hammer v. State, 296 S.W.3d 555, 568 (Tex.Crim.App. 2009). Based on this presumption, our review of the record, and the relevant Rule 403 criteria, we conclude the probative value of the extraneous-offense evidence was not substantially outweighed by any prejudicial impact.
Extraneous Offense Testimony During Guilt-Innocence Phase
In advance of cross-examining Appellant at trial, the State informed the trial court that it wished to cross-examine Appellant regarding his prior history of family-violence assault. The State explained that Azucena Batres was the victim in a prior prosecution for assault-family violence in *421 which Appellant had stated, as in this case, that he was "just pushing" the victim away as she continued to approach him and he then squeezed her neck with his hands. The State sought to cross-examine Appellant for purposes of impeachment as well as absence of mistake and accident. The trial court declined to permit the State to cross-examine Appellant regarding the family violence case but agreed to conduct a 404(b) hearing outside the presence of the jury to determine whether it would allow Batres to testify as a rebuttal witness.
During the 404(b) hearing, Batres testified that when she and Appellant had been a couple living together, Appellant became angry because her cell phone was off, a struggle ensued, and Appellant pushed Batres onto the bed and twice placed his hands on her neck as she scratched, attempted to fight and push away from Appellant while attempting to defend herself. After Batres's seven-year-old son entered the room and instructed Appellant to leave his mother alone, Appellant called his daughter and then left the home. Photographs of Batres's injuries, which showed bruising to the neck and an arm, were admitted for purposes of the hearing. Batres stated the marks were not present before Appellant put his hands around her neck, and denied under cross-examination that she had caused the injuries herself. She testified that Appellant had previously pulled her hair and that their arguments were primarily about his jealousy. On one occasion Batres arose in the night to go to the bathroom, and when she returned, Appellant asked her, "Where are you coming from? With whom were you with?"
After considering the Rule 404(b) factors, the trial court ruled that it would allow Batres to testify as a rebuttal witness. When the State affirmatively waived impeachment of Appellant on cross-examination, defense counsel argued that Batres's testimony was then irrelevant because there had been no claim of accident or mistake if that was the basis for Batres's testimony. The trial court reiterated that it had considered the balancing factors and had made its ruling.
At defense counsel's request, the trial court provided a limiting instruction to the jury before Batres testified. Batres explained to the jury that she had turned her phone off during the night as Appellant had directed. Appellant became angry the next day because Batres had left the phone turned off, and he could not call her while they were both within their home. Batres understood that she was to have her phone turned off during the day as well, but also testified that it was not unusual for Appellant to be upset about her phone being turned off. Appellant then asked Batres where she had been hiding, and directed her to give her phone to him. When she complied, Appellant broke the phone. This incited an argument between them, during which Appellant twice placed his hands around Batres's neck as well as on her chest. During this encounter, Batres proclaimed to Appellant, "But I spent the [past] 24 hours with you." The trial court admitted into evidence the photographs of Batres's neck and arm injuries that Appellant had inflicted. At the conclusion of Batres's testimony, the trial court again provided a limiting instruction to the jury.
Analysis
Appellant contends the trial court erred in its Rule 404(b) ruling because the State offered Batres's testimony regarding Appellant's extraneous bad acts to show absence of mistake or accident, when he did not urge defenses of mistake of law or mistake of fact at trial. Even if this contention is correct, this extraneous offense evidence *422 was relevant and probative of Appellant's intent to harm Lilia. Moreover, this evidence tended to disprove Appellant's contention that Lilia died as a result of an unintentional act committed while he was acting in self-defense, which is a defensive theory that Appellant did urge at trial and on which the trial court instructed the jury. See Rogers v. State , 105 S.W.3d 630, 633 n.4 (Tex.Crim.App. 2003) (trial court allowed State to ask defendant about prior aggravated assault conviction to rebut defensive theories of self-defense and accident, and its admission of the extraneous evidence showing that defendant had assaulted and stabbed first spouse during a fight in the same manner the State alleged the defendant had shot his second wife during a fight was probative of defendant's assaultive mental intent to harm second wife and tended to disprove defendant's contention that the charged offense resulted from an unintentional shooting) citing Johnson v. State , 963 S.W.2d 140, 144 (Tex.App.-Texarkana 1998, pet. ref'd) (upholding admission of extraneous aggravated assault offense committed by defendant and noting when defendant claims self-defense or accident, State may introduce evidence of other violent acts where defendant was an aggressor in order to show accused's intent). Because the trial court's evidentiary ruling was correct under this theory of applicable law, we will not disturb it. De La Paz , 279 S.W.3d at 344.
Moreover, we conclude that this evidence had little, if any, tendency to mislead or confuse the jury, and that any such tendency was substantially outweighed by its probative value to rebut Appellant's self-defense theory. In light of these facts, the trial court's ruling that the danger of unfair prejudice did not substantially outweigh the probative value of the extraneous offenses was not an abuse of discretion. See Montgomery , 810 S.W.2d at 392 (appellate courts should reverse the judgment of trial court on its finding of whether probative value of evidence of other crimes, wrongs, or acts is substantially outweighed by danger of unfair prejudice only rarely and only after clear abuse of discretion is shown) citing United States v. Maggitt , 784 F.2d 590, 597 (5th Cir. 1986). We overrule Issue Three and affirm the judgment of the court below.
Hughes, J., not participating

No order denying the motion to suppress is present in the record on appeal. The record on appeal must sufficiently reflect that the trial court ruled adversely on the motion. Montanez v. State , 195 S.W.3d 101, 104 (Tex.Crim.App. 2006). Here, the reporter's record shows the trial court expressly overruled the motion to suppress Appellant's statement.